998 F.2d 842
 37 ERC 1043, 62 USLW 2079, 23 Envtl.
L. Rep. 21,312
 FMC CORPORATION, a Delaware corporation; Hewlett Packard
Company, a California corporation; Monsanto Company, a
Delaware corporation; National Semiconductor Corporation, a
Delaware corporation, Plaintiffs-Appellees-Cross-Appellants,
v.
AERO INDUSTRIES, INC., a Nevada corporation; Xtron
Corporation, a Nevada corporation; Perry Russell,
individually and as agent for defendants Aero Industries and
Xtron Corporation, Defendants-Cross-Appellees,
and
Robert Terry, individually and as agent for defendants Aero
Industries and Xtron Corporation,
Defendant-Appellant-Cross-Appellee.
 Nos. 92-4040, 92-4048.
 United States Court of Appeals,
Tenth Circuit.
 July 9, 1993.
 
 Robert Terry, pro se.
 David W. Tundermann, David G. Mangum and J. Michael Bailey of Parsons, Behle & Latimer, Salt Lake City, UT, for plaintiffs-appellees-cross-appellants.
 Before SEYMOUR and TACHA, Circuit Judges, and ROGERS,* District Judge.
 SEYMOUR, Circuit Judge.
 
 
 1
 Defendant Robert M. Terry appeals the judgment rendered against him and in favor of FMC Corporation, Hewlett Packard Company, Monsanto Company, and National Semiconductor Corporation (plaintiffs) for response costs incurred by plaintiffs in removing hazardous waste materials from a site pursuant to the requirements of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9601-9657. Plaintiffs' cross appeal for attorneys fees incurred both in the waste removal process and in the response cost recovery litigation. We affirm in part, reverse in part, and remand for further proceedings.
 
 I.
 
 2
 Defendant Aero Industries, Inc. purchased the facility at issue at a bankruptcy auction through its Chief Executive Officer Mr. Terry. The property had been used as a gallium and arsenic refining facility. Despite knowing this, Aero did not investigate the environmental condition of the property prior to the purchase. Defendants either knew or could have discovered the condition of the site because the bankruptcy file contained notices advising potential purchasers of alleged contamination on the premises and possible state and federal regulatory problems. After the purchase, the Utah Department of Health contacted Aero and indicated its concern regarding hazardous materials on the site and requested Aero's compliance with a state approved closure plan for the site. Aero repeatedly assured the State that it would comply with the closure plan. Although it had initially planned to sell the property and dispose of any hazardous substances, Aero later decided to reopen the facility.
 
 
 3
 Defendants Robert Terry and Perry Russell[1] formed defendant Xtron Corp. as a manufacturing firm for gallium arsenide. Aero had a fifty percent interest in Xtron, and Mr. Terry served as chairman of the board for both corporations. Aero and Mr. Terry were the sole source of capital for Xtron and controlled Xtron's finances.
 
 
 4
 In order to operate the facility, defendants remodeled and made improvements to the site, purchased equipment leased by the previous owner, purchased other equipment, recontainerized and relocated hazardous materials, solicited customers to purchase planned products and hazardous material, conducted a test burn of the gallium crystal furnace, shipped some hazardous material for offsite disposal, and solicited suppliers of gallium arsenide scrap for recycling. Defendants did not, however, comply with the state-approved closure plan or transport hazardous materials offsite for recycling or otherwise properly dispose of them. Mr. Terry had authority over Aero's and Xtron's activities concerning the site.
 
 
 5
 In May 1988, the EPA notified Aero, Xtron, plaintiffs and others that they were potentially responsible parties liable for removal of hazardous materials at the site. On July 12, 1988, EPA issued a unilateral administrative order under CERCLA directing Aero, Xtron, plaintiffs and others to take action to remove hazardous substances and contaminated soil from the site and to reduce threats of exposure to such materials. Plaintiffs and defendants entered into an agreement to clean up the site. Plaintiffs and Texas Instruments agreed to do various things including removal of contaminated soil related to treater dust piles. Defendants agreed, among other things, to remove contaminated soil related to storage ponds. Plaintiffs and Aero sent the EPA a joint letter specifying the tasks which the parties had agreed to complete.
 
 
 6
 Fearing penalties under the EPA order, plaintiffs alone commenced cleanup work in September 1988. Due to a lack of funds, defendants did not perform any of the cleanup they had agreed to perform. In August 1989, the EPA accepted plaintiffs' cleanup and certified that their response costs for the removal were necessary and not inconsistent with the National Contingency Plan.
 
 
 7
 Plaintiffs incurred $970,605.20 in response costs in conducting the removal action. They also incurred $244,287.89 for nonlitigation removal-related attorney's fees and costs, and a substantial amount of litigation fees and costs.
 
 
 8
 Plaintiffs filed suit for cost recovery against defendants. Defendants filed a motion to dismiss and a demand for a jury trial. The district court granted plaintiffs' motion for partial summary judgment on the issue of liability, holding defendants jointly and severally liable as owners and operators for response costs. The remaining issues concerning allocation of the response costs were to be tried. The parties' pretrial order and two modified pretrial orders specified that the trial would be to the court without a jury. After the bench trial, the district court entered findings of fact and conclusions of law allocating to defendants jointly and severally twenty-five percent of plaintiffs' total response costs. The district court denied plaintiffs' request for litigation and nonlitigation attorneys fees and costs as part of the response costs. The court concluded as a matter of law that attorneys fees do not constitute response costs under CERCLA. The court entered judgment in favor of plaintiffs for $311,368.03. Only Mr. Terry appealed. Plaintiffs cross-appealed, objecting to the portion of the judgment denying attorneys fees and costs as not constituting recoverable response costs.
 
 II.
 
 9
 On appeal, Mr. Terry first argues that the CERCLA cost recovery action should have been tried to a jury. He and the other defendants did request trial by jury. However, the pretrial order, which was signed by Mr. Terry, and modified pretrial orders stated there would be a bench trial. Moreover, Mr. Terry did not object to the bench trial. We hold that Mr. Terry waived any right he may have had to a jury trial by signing the pretrial order and participating in the bench trial.[2] See White v. McGinnis, 903 F.2d 699, 703 (9th Cir.) (en banc), cert. denied, 498 U.S. 903, 111 S.Ct. 266, 112 L.Ed.2d 223 (1990); Royal Am. Managers, Inc. v. IRC Holding Corp., 885 F.2d 1011, 1018 (2d Cir.1989); Lovelace v. Dall, 820 F.2d 223, 227 (7th Cir.1987) (pro se); United States v. 1966 Beechcraft Aircraft Model King Air A90 Cream with Burg & Gold Stripes SN:LJ-129, FAA Reg: 333GG, Equipt, 777 F.2d 947, 950-51 (4th Cir.1985); Southland Reship, Inc. v. Flegel, 534 F.2d 639, 644 (5th Cir.1976). See generally 9 Charles A. Wright & Arthur P. Miller, Federal Practice & Procedure § 2321 (1971) ("right to jury trial may ... be waived by conduct or agreement of the parties.").
 
 III.
 
 10
 Mr. Terry's second argument on appeal is that he is not liable because he did not contribute to the dumping of hazardous waste on the site and he is not an operator and not in control of Aero or Xtron. He maintains that various nonparties should instead be held liable for their portion of any cleanup costs.
 
 
 11
 The district court entered partial summary judgment for plaintiffs determining that all defendants were jointly and severally liable for response costs. The court specifically held Mr. Terry liable as an operator. This court reviews the grant of summary judgment de novo, applying the same legal standard used by the district court under Fed.R.Civ.P. 56(c). Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir.1990). "Summary judgment is appropriate when there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." Russillo v. Scarborough, 935 F.2d 1167, 1170 (10th Cir.1991). This court must view the record in the light most favorable to the nonmoving party. Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir.1991).
 
 
 12
 To establish a prima facie case of liability in a CERCLA cost recovery action, a plaintiff must prove (1) the site is a facility as defined in 42 U.S.C. § 9601(9), (2) defendant is a responsible person as defined in 42 U.S.C. § 9607(a), (3) the release or threatened release of a hazardous substance has occurred, and (4) the release or threatened release has caused the plaintiff to incur response costs. Amoco Oil Co. v. Borden, Inc., 889 F.2d 664, 668 (5th Cir.1989). Only the second element is at issue in this case.
 
 
 13
 Section 9607(a)(1) defines a responsible party as any owner or operator of a facility. An owner or operator is defined as a person who participates in the management of a facility and who is not merely a stockholder. 42 U.S.C. § 9601(20)(A). In determining whether a person is an operator, some courts do not require the defendant to have exercised actual control in order to qualify as operators under section 9607(a) as long as the authority to control was present. See United States v. Carolina Transformer Co., 978 F.2d 832, 837 (4th Cir.1992); Nurad, Inc. v. William E. Hooper & Sons Co., 966 F.2d 837, 842 (4th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992). In United States v. Kayser-Roth Corp., 910 F.2d 24, 27 (1st Cir.1990), cert. denied, 498 U.S. 1804, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991), however, the court said:
 
 
 14
 To be an operator requires more than merely complete ownership and the concomitant general authority or ability to control that comes with ownership. At a minimum it requires active involvement in the activities of the subsidiary.
 
 
 15
 See also Redland Soccer Club, Inc. v. Dep't of the Army of the United States, 801 F.Supp. 1432, 1437 (M.D.Pa.1992); Bowen Eng'g v. Estate of Reeve, 799 F.Supp. 467, 474 (D.N.J.1992). On the other hand, actual control and personal participation in the wrongful conduct clearly makes one an operator under CERCLA. See United States v. Northeastern Pharmaceutical & Chem. Co., 810 F.2d 726, 743 (8th Cir.1986), cert. denied, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); Riverside Mkt. Dev. Corp. v. International Bldg. Prods., Inc., 931 F.2d 327, 330 (5th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 636, 116 L.Ed.2d 654 (1991).
 
 
 16
 We need not decide which approach is best because it is undisputed on the record that Mr. Terry exercised actual control and personally participated in any conduct that violated CERCLA. He made the decision for Aero to purchase the property. He searched for potential purchasers of the hazardous material. He authorized the cleanup and closure agreements made to state and federal officials. On behalf of Aero, he signed the agreement with plaintiffs that they would jointly comply with the EPA's unilateral administrative order and conduct removal activities on the site. He made the decision to reopen operations at the site after deciding to set up Xtron. He was chairman of the board of Xtron, and he controlled its finances. The president of Xtron sent Mr. Terry regular reports concerning the operation and handling of hazardous wastes. When it proved too difficult to put the site back into full operation, Mr. Terry attempted to merge Xtron with another company. When the merger failed, he decided to stop Xtron's business operations and abandoned the site. He negotiated the sale of the equipment on the site and arranged for its shipping. The evidence thus fully supports the district court's conclusion that Mr. Terry was an operator.[3] Accordingly, the district court did not err in granting partial summary judgment in favor of plaintiffs on this issue.[4]
 
 IV.
 
 17
 Mr. Terry argues that the district court erred in allocating twenty-five percent of the response costs to defendants. He maintains that such costs should have been allocated to nonparties. A district court has considerable discretion in apportioning equitable shares of response costs. United States v. R.W. Meyer, Inc., 932 F.2d 568, 571 (6th Cir.1991); Amoco Oil Co. v. Borden, Inc., 889 F.2d at 672. It can allocate the response costs among the liable parties using any equitable factors it deems appropriate. 42 U.S.C. § 9613(f)(1). The court must balance the equities in light of the totality of the circumstances. R.W. Meyer, Inc., 932 F.2d at 572; see United States v. Alcan Aluminum Corp., 990 F.2d 711, 722, (2d Cir.1993) (apportionment is intensely factual determination).
 
 
 18
 After reviewing the record and the district court's findings, we cannot say that the court abused its discretion in making the twenty-five percent apportionment. It considered the evidence and rejected plaintiffs' request for fifty percent contribution. It considered the liability of nonparties in apportioning the costs, as well as other relevant factors. Mr. Terry did not establish that his costs should have been less due to liability of nonparties.
 
 V.
 
 19
 In their cross appeal, plaintiffs argue that the district court erred in disallowing their litigation and nonlitigation removal-related attorneys fees and costs as a matter of law. The district court held that CERCLA contains no explicit authorization for permitting the recovery of attorneys fees and costs as response costs. This legal conclusion is reviewable de novo. United States v. Hardage, 982 F.2d 1436, 1446 (10th Cir.1992).
 
 
 20
 Under section 9607(a)(4)(B), a private party may recover the "necessary costs of response." CERCLA defines "response" to include "enforcement activities related thereto." 42 U.S.C. § 9601(25). Plaintiffs contend that this language authorizes an award of fees incurred both in litigating the recovery action and in removal-related nonlitigation activities. We agree with plaintiffs in part.
 
 
 21
 We turn first to the availability of litigation fees for the recovery suit. "[T]he law of the United States ... has always been that absent explicit congressional authorization, attorneys' fees are not a recoverable cost of litigation." Runyon v. McCrary, 427 U.S. 160, 185, 96 S.Ct. 2586, 2602, 49 L.Ed.2d 415 (1976). The circuits have split on whether the statutory language quoted above contains the requisite explicit authority to award litigation fees. Compare Donahey v. Bogle, 987 F.2d 1250, 1256 (6th Cir.1993) (litigation fees may be awarded); General Elec. Co. v. Litton Indus. Automation Sys., Inc., 920 F.2d 1415, 1422 (8th Cir.1990) (same), cert. denied, --- U.S. ----, 111 S.Ct. 1390, 113 L.Ed.2d 446 (1991), with Juniper Dev. Group v. Kahn (In re Hemingway Transp., Inc.), 993 F.2d 915, 933 (1st Cir.1993) (litigation fees not recoverable); Stanton Rd. Assocs. v. Lohrey Enters., 984 F.2d 1015, 1018-19 (9th Cir.1993) (same).
 
 
 22
 We simply cannot agree with those courts that find an explicit authorization for the award of litigation fees from the fact that response costs include related enforcement activities. We recognize that CERCLA is designed to encourage private parties to assume the financial responsibility of cleanup by allowing them to seek recovery from others. It may be true that awarding the litigation fees incurred in that recovery would further this goal. Nonetheless, the efficacy of an exception to the American rule is a policy decision that must be made by Congress, not the courts. The desirability of a fee-shifting provision cannot substitute for the express authorization mandated by the Supreme Court. See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 263-64, 95 S.Ct. 1612, 1624-25, 44 L.Ed.2d 141 (1975). Accordingly, we conclude that a private party may not recover attorneys fees arising from the litigation of a private recovery action.
 
 
 23
 We reach a different legal conclusion, however, with respect to nonlitigation attorneys fees. Such fees do not fall under the American rule set out in Alyeska and Runyon because they are not incurred in pursuing litigation. Accordingly, recovery of these fees is not barred as a matter of law. Rather, the issue is whether nonlitigation attorneys fees are necessary response costs within the meaning of section 9607(a)(4)(B).
 
 
 24
 We considered a related question in Hardage, 982 F.2d 1436. Although that case is distinguishable on its facts, our discussion there of necessary costs is instructive. In Hardage, the government sought injunctive relief against HSC to require it to clean up a Superfund site. HSC counterclaimed against the government as a responsible party for response costs HSC incurred, inter alia, in developing its trial remedy. The district court found, as a matter of fact, that these litigation-related response costs were not necessary costs under section 9607(a)(4)(B). In affirming, we stated that " 'necessary costs of response' must be necessary to the containment and cleanup of hazardous releases." Id. at 1448 (citing Daigle v. Shell Oil Co., 972 F.2d 1527, 1535-37 (10th Cir.1992)). Applying this definition to the particular facts of that case, we held that "when a private party incurs response costs in developing its own remedy, solely to defend against the government's § 106(a) injunction action, the private party's response costs are not 'necessary' within the meaning of [section 9607(a)(4)(B) ]." Id. (emphasis added).
 
 
 25
 In the instant case, as distinguished from Hardage, plaintiffs incurred response costs complying with a unilateral EPA order and performing the cleanup work under EPA direction. Plaintiffs seek recovery of the nonlitigation attorneys fees generated in designing and negotiating the removal action and in preparing and carrying out the work plan approved by the EPA. For example, plaintiffs submitted affidavits to the district court evidencing fees paid for negotiating and drafting contracts with environmental professionals who performed the removal work, negotiating changes to the work plan, and monitoring work progress. We cannot say as a matter of law that, under the circumstances here, none of these nonlitigation attorneys fees were necessary response costs. Accordingly, we must remand to the district court for further proceedings to ascertain whether any of the nonlitigation attorneys fees sought by plaintiffs were necessary to the containment and cleanup of hazardous releases and therefore recoverable as necessary costs.
 
 
 26
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.
 
 
 
 *
 The Honorable Richard D. Rogers, Senior United States District Judge, United States District Court for the District of Kansas, sitting by designation
 
 
 [1]
 Russell was later dismissed as a defendant
 
 
 [2]
 In addition to arguing waiver, plaintiffs contend that Mr. Terry did not have a right to a jury trial. Given our disposition, we need not address this contention
 
 
 [3]
 Mr. Terry also contends that he was an innocent purchaser who did not contribute to the dumping of hazardous materials on the site and therefore cannot be held responsible as an owner. Because he was found liable as an operator and not as an owner of the site, we need not address this argument
 
 
 [4]
 In his opening brief at pages 29-34 and 36-39, Mr. Terry lists several findings of fact which he disputes. His disputes are not as to material facts and therefore do not affect the district court's determination that he was an operator. He also contends that Gordon Bird, the on-site manager of Xtron, had authority and control rather than Mr. Terry. Although Mr. Bird may have been an operator, that does not preclude Mr. Terry from also being an operator